*ARKANSAS DEMOCRAT-GAZETTE;*
Arkansas Press Association; Associated Press;
KFSM-TV; *Morning News of Northwest Arkansas;*
*Northwest Arkansas Times v.*
Judge Stacey ZIMMERMAN

00-641                                                    20 S.W.3d 301

Supreme Court of Arkansas
Opinion delivered June 29, 2000

772

*Williams & Anderson LLP*, by: *John E. Tull III* and *Kristine G. Baker*, for petitioners *Arkansas Democrat-Gazette*, Arkansas Press Association, Associated Press, and KFSM-TV.

*Mark Hinueber* for petitioner *Morning News of Northwest Arkansas*.

*Lisle Law Firm*, by: *Chris Lisle*, for petitioner *Northwest Arkansas Times*.

*Mark Pryor*, Att'y Gen., by: *Brian G. Brooks*, Ass't Atty Gen., for respondent.

ROBERT L. BROWN, Justice. The petitioners, Arkansas Democrat-Gazette ("Democrat-Gazette"), Arkansas Press Association, Associated Press, KFSM-TV, Morning News of Northwest Arkansas, and Northwest Arkansas Times (collectively, "the media"), have petitioned this court for a writ of *mandamus*-directing respondent, who is Juvenile Judge Stacey Zimmerman, to revoke her gag order on the press entered on May 18, 2000. We agree with petitioners that the gag order is too broad, and because of its breadth, constitutes a prior restraint on the press. We grant a writ of *certiorari* and direct Judge Zimmerman to modify her gag order in accordance with this opinion.

What gives rise to this original action for *mandamus* is the delinquency case brought by the State against Michael Nichols, age 12. Nichols allegedly was involved in an exchange of gunfire with Prairie Grove police officer, Sergeant Greg Lovett, on May 11, 2000. Both Nichols and the police officer were wounded. On May 17, 2000, Nichols was charged with attempted capital murder in juvenile court in *State v. Nichols*, Case No. J 2000-554 (Washington County Juvenile Court). The case was assigned to Judge Zimmerman. Following the shooting, a yearbook photograph of Nichols and his name were published in the media. Nichols's parents were also identified, and the name and employment of the victim were published.

On May 18, 2000, juvenile proceedings began before Judge Zimmerman. This was Nichols's first appearance in juvenile court. He was advised of the charge against him, and he pled innocent. The hearing was open to the public, and members of the media were present. At the beginning of the hearing, the judge orally issued a gag order without prior notice that she was going to do so. She ordered that (1) no information be released by the media in the Nichols case except what was stated on the record at the hearings, (2) no names or pictures of the victim and the victim's family be disseminated in the media, (3) no names or pictures of Nichols or his family be disseminated in the media, and (4) no names or pictures of juveniles in the courthouse be broadcast or released by the media. The court order memorializing the oral gag order was entered at 4:03 p.m. on that same day and includes the following:

3. The Court hereby issues a gag order in this case and orders no names or pictures of the victim and victim's family or the juvenile defendant and juvenile defendant's family be published or disseminated in any manner. The only matters that may be published by the media are those stated on [the] record the (sic) in this court;

4. No pictures of the juveniles who are present in the Courts Building, or entering or leaving the Courts Building, shall be disseminated by the media.

After the judge's oral gag order, a reporter for the Democrat–Gazette told a Democrat–Gazette photographer outside the courtroom that the judge had issued a gag order. Later that day, the photographer took photographs of Nichols's parents outside the courthouse and of Nichols leaving the courthouse with a coat over his head and escorted by two police officers. The photographs were published in the Democrat–Gazette the next day.

On May 20, 2000, Judge Zimmerman held a second hearing on the Nichols matter. At that time, she orally modified her gag order to permit dissemination of pictures obtained by the media prior to her May 18 gag order. Her gag order regarding future photographs of the juvenile, the victim, and their families remained in effect. In modifying her order, she noted that she was within her statutory authority to restrict the dissemination of future photographs and stated that the public's right to know events through the media must be "balanced with the confidentiality requirements and the spirit of the Juvenile Code." This oral modification was memorialized in an order entered by the judge on June 2, 2000. That order stated in pertinent part:

3. The Court hereby modifies the Order of May 18, 2000 with respect to the publication and dissemination of the juvenile defendant's name and the photograph of the juvenile defendant published before the May 18, 2000 detention hearing, as the Court cannot restrict the dissemination of the juvenile's name and photograph published before the May 18, 2000 detention hearing.

4. The Court reiterates its prior Order of May 18, 2000 that no pictures of the juvenile defendant or any other juvenile who is present in the Courts Building shall be disseminated by the media, and no pictures of any juvenile entering or leaving the Courts Building shall be disseminated by the media.

5. The Court reiterates its prior order that no pictures of the defendant's family or victim's family shall be published or disseminated in any manner.

6. Juvenile Court staff, prosecutors and defense attorneys in the case are restricted from discussing the particular facts of the case with the media while case is pending.

The judge's May 20 order also set a hearing for May 25, 2000, in response to a motion by Nichols's attorney, to determine whether the Democrat-Gazette should be held in contempt of court for violating the judge's gag order and further to decide the media's motion to intervene in the Nichols proceedings.

On May 25, 2000, Judge Zimmerman conducted the show-cause hearing and heard testimony from witnesses for the Democrat-Gazette. Following the hearing, she held the Democrat-Gazette in contempt of court and fined the newspaper $100. Pursuant to a motion by Nichols's attorney, she ordered that further proceedings in the Nichols case be closed to the public. Judge Zimmerman also denied the media's motion to intervene and stated that their remedy for attacking the gag order was by petition for writ of *mandamus* to this court. Her oral ruling was memorialized in a sixteen-page order entered on June 5, 2000. In that order, she reiterated that her gag order set out in her May 18 and May 20 orders remained in effect.

On June 6, 2000, the adjudication hearing for Nichols began. Prior to the hearing, Judge Zimmerman entered a handwritten order opening the hearing to the public. The order included the following:

1. Upon the Defendant's request, the Court hereby opens the hearings to the public, pursuant to 9-27-325 ACA.

2. However, the Court's previous order of May 20th shall remain in effect.

3. No tape recorders or photography shall be permitted in the courtroom.

4. The juvenile defendant's case file is still sealed and closed to the public.

On May 31, 2000, the media filed a petition for writ of *mandamus* and for temporary relief or, alternatively, for an accelerated proceeding. By *per curiam* order dated June 6, 2000, this court expedited consideration of the *mandamus* petition but denied a temporary stay of the gag order. *Arkansas Democrat-Gazette v. Zimmerman*, 341 Ark. 525, 19 S.W.3d 1 (2000).

## I. Writ of Certiorari

We first examine whether a writ of *mandamus* is the proper remedy for correcting a prior restraint of the media. The purpose of a writ of *mandamus* is to enforce an established right or to enforce the performance of a duty. *Manila Sch. Dist. No. 15 v. White*, 338 Ark. 195, 992 S.W.2d 125 (1999). A writ of *mandamus* is issued by this court only to compel an official or judge to take some action. *Raines v. State*, 335 Ark. 376, 980 S.W.2d 269 (1998). When requesting a writ of *mandamus*, a petitioner must show a clear and certain right to the relief sought and the absence of any other adequate remedy. *Hanley v. Arkansas State Claims Comm'n*, 333 Ark. 159, 970 S.W.2d 198 (1998). But a writ of *mandamus* will not lie to control or review matters of discretion. *Saunders v. Neuse*, 320 Ark. 547, 898 S.W.2d 43 (1995). In contrast, a writ of prohibition is issued by this court to prevent or prohibit the lower court from acting wholly without jurisdiction. *Raines v. State, supra*. While *mandamus* compels action, prohibition prevents it from occurring. *Id.* A writ of *certiorari* is appropriate when it is apparent on the face of the record that there has been a plain, manifest, clear, and gross abuse of discretion by the trial judge, and there is no other adequate remedy. *Arkansas Pub. Defender Comm'n v. Burnett*, 340 Ark. 233, 12 S.W.3d 191 (2000).

In the past, this court has issued a writ of *mandamus*, a writ of prohibition, and a writ of *certiorari* under different circumstances to void a prior restraint of the press by a trial judge. *See Ark. Gazette Co. v. Lofton*, 269 Ark. 109, 598 S.W.2d 745 (1980) (writ of *mandamus*); *Brown v. Kimbrough, Judg.*, 263 Ark. 913, 568 S.W.2d 226 (1978) (writ of prohibition); *Wood v. Goodson*, 253 Ark. 196, 485 S.W.2d 213 (1972) (writ of *certiorari*). In *Brown v. Kimbrough, supra*, this court held that a petition for a writ of prohibition was the proper avenue of relief in a prior restraint case where the prosecuting attorney sought an injunction from the chancery court against

the future sale of any "writing, picture, motion picture, films, slides, drawings, or other visual reproductions of obscene materials." The chancery court had not acted on the injunction at the time that the petition for the writ was filed. This court concluded that prohibition was appropriate:

> Our cases regularly recognize that prohibition will lie to prohibit a trial tribunal wholly without jurisdiction or one that is threatening to act in excess of its jurisdiction where the remedy by appeal is inadequate. *Skinner v. Mayfield*, 246 Ark. 741, 439 S.W.2d 651 (1969), and *Bassett v. Bourland*, 175 Ark. 271, 299 S.W.2d 14 (1927). Since there exists no remedy against the State to restore or grant redress to a person who has been deprived by prior restraint of his right to exercise freedom of speech and press for whatever length of time the prior restraint may exist, it follows that petitioners' have no adequate remedy by appeal from such injunction issued in excess of the trial court's jurisdiction.

*Id.* at 918, 568 S.W.2d at 229.

■ The *Brown* decision does not appear to be precedent for the case before us. In *Brown*, the chancery court had not acted. Here, Judge Zimmerman has already acted by issuing her gag order. Prohibition would not be appropriate under these circumstances, because this court cannot now prohibit the trial court from doing what has already been done. *See Pike v. Benton Circuit Court*, 340 Ark. 311, 10 S.W.3d 447 (2000).

In *Arkansas Gazette Co. v. Lofton, supra*, the Gazette challenged the circuit court's gag order restricting the newspaper from referring to a criminal defendant as the "Quapaw Quarter rapist" in its articles. The Gazette asked this court to issue a writ of *mandamus*. In determining that the writ should issue, we stated that the judge's restraint of First Amendment freedom of the press amounted to "judicial censorship which is beyond the jurisdiction of this or any court." *Id.* at 111, 598 S.W.2d at 747. In determining that *mandamus* was the proper remedy, this court referred the parties to its reasoning in *Commercial Printing Co. & Tosco v. Lee*, 262 Ark. 87, 553 S.W.2d 270 (1977). In *Commercial Printing*, the trial judge had excluded the public and press from *voir dire* examination of prospective jurors in a criminal trial by conducting the proceedings in chambers. The press filed a petition for a writ of *mandamus* in this court, but respondent argued that *mandamus* was not the proper

remedy. We disagreed and pointed out that *mandamus* may be used to prevent irreparable injury. We said in *Commercial Printing* that this was not a matter "which addressed itself to the discretion of the trial court, for the court lacked the authority to prohibit the public and press from the voir dire examination — which is the sole question presently before this court." 262 Ark. at 93, 553 S.W.2d at 273.

Finally, in *Wood v. Goodson, supra*, this court stated that the appropriate avenue for relief in correcting a prior restraint was *certiorari*. In that case the judge had ordered the press not to publish the jury verdict finding the defendant guilty for a period of time owing to additional charges awaiting trial against that same defendant. We held that the judge did not have the power to prohibit the news media from publishing information about what transpired in open court.

■ It is axiomatic, however, that writs of *mandamus* are not issued by this court to review or control a trial court's exercise of discretion. *Tyson v. Roberts*, 287 Ark. 409, 700 S.W.2d 50 (1985). We hold that although the petitioners have asked this court for a writ of *mandamus* compelling the judge to rescind her gag order, a writ of *certiorari* is the more appropriate remedy because the issue before this court is whether Judge Zimmerman's action in gagging the media was on its face a plain, manifest, clear, and gross abuse of discretion and in excess of her authority. *See, e.g., Arkansas Pub. Defender Comm'n v. Bennett, supra*. Thus, we will treat the media's petition for *mandamus* as one for *certiorari*. *See Childress v. Humphrey*, 329 Ark. 504, 950 S.W.2d 220 (1997) *(per curiam)* (petition for *mandamus* treated as petition for *certiorari*).

### II. Prior Restraint

■ We turn then to the merits of this case. The focal point of the petition is whether Judge Zimmerman's gag order constituted a prior restraint of the media, which contravenes the First Amendment to the United States Constitution and Article 2, § 6, of the Arkansas Constitution. The United States Supreme Court has held that a prior restraint of the press cannot transpire unless it is "accomplished with procedural safeguards that reduce the danger of suppressing constitutionally protected speech." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975). This court has said in the

same vein that "any restraint on the freedom of the press, even though narrow in scope and duration, is subject to the closest scrutiny and will be upheld only upon a clear showing that an exercise of this right presents a clear and imminent threat to the fair administration of justice." *Arkansas Gazette Co. v. Lofton,* 269 Ark. at 110, 598 S.W.2d at 746 (citing *United States v. CBS, Inc.*, 497 F.2d 102 (5th Cir. 1974)). We have said in addition: "While prior restraints are not unconstitutional *per se*, any system of prior restraint bears a heavy presumption against its constitutional validity." *Orrell v. City of Hot Springs*, 311 Ark. 301, 304, 844 S.W.2d 310, 312 (1992) *(citing FW/PBS, Inc. v. City of Dallas*, 110 S.Ct. 596 (1990)).

■■■ While the United States Supreme Court has not held that the press or the public enjoys a constitutional right of access to juvenile proceedings, it has recognized that the public has a right of access to criminal trials for adults. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) (Burger, C.J., plurality opinion). The Court has also recognized that this right of access is not absolute, and if it is necessary to protect an "overriding interest articulated in findings," courtrooms may be closed, or less restrictive, alternative restraints may be imposed. *Id.* at 581.

A seminal case on prior restraints is *Nebraska Press Assoc. v Stuart*, 427 U.S. 539 (1976). In *Nebraska Press,* a trial court had entered an order restraining the news media from publishing any admission or confession of the adult defendant revealed at a preliminary hearing or from broadcasting any facts "strongly implicative" of the defendant. The gag order prohibited everyone in attendance in the courtroom from "releasing or authorizing the release for public dissemination in any form or manner whatsoever any testimony given or evidence adduced." The Nebraska Supreme Court affirmed the order as modified. In reversing the Nebraska Supreme Court, the Court noted that while the trial court acted out of legitimate concern in an effort to protect the defendant's right to a fair trial, this concern must be balanced against the freedoms guaranteed under the First Amendment. The Court discussed previous prior restraint cases and noted: "The thread running through all these cases is that prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Id.* at 559. The Court then held:

> To the extent that this order prohibited the reporting of evidence adduced at the open preliminary hearing, it plainly violated settled principles: "(T)here is nothing that proscribes the press from reporting events that transpire in the courtroom." ... The County Court could not know that closure of the preliminary hearing was an alternative open to it until the Nebraska Supreme Court so construed state law; but once a public hearing had been held, what transpired there could not be subject to prior restraint.

*Id.* at 568 (citations omitted). Under *Nebraska Press*, trial judges may not order reporters not to reveal lawfully acquired information once they have been admitted to the courtroom.

While *Nebraska Press* dealt with a criminal proceeding involving an adult, the Supreme Court has addressed a similar situation in juvenile court. In *Oklahoma Publ'g Co. v. Dist. Court*, 430 U.S. 308 (1977), the press attended an open juvenile delinquency detention hearing without objection from defense counsel. While there, they learned the defendant's name, and as the juvenile was being escorted from the courthouse to a vehicle, a photographer took his picture. Thereafter, a number of stories using the boy's name and photograph were printed in numerous newspapers. Additionally, radio stations broadcast his name and television stations showed footage of him. Subsequently, the juvenile court enjoined the media from "publishing, broadcasting, or disseminating, in any manner, the name or picture of (a) minor child" in connection with the proceeding. The Supreme Court of Oklahoma denied the petitioner's writs of prohibition and *mandamus,* relying on Oklahoma statutes which provided that juvenile proceedings are to be held in private "unless specifically ordered by the judge to be conducted in public," and that juvenile records are open to public inspection only by order of the court.

The Court specifically did not address the constitutionality of the Oklahoma statutes but, rather, considered whether the First and Fourteenth Amendments allow a court to prohibit the publication of widely disseminated information obtained at court proceedings which were open to the public. The Court noted that it had previously held that the press may not be prohibited from "truthfully publishing information released to the public in official court records." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975) (where rape victim's name lawfully acquired, state could not impose sanctions on press for publication of the name). The Court struck

down the order, holding that once the media had been admitted to the courtroom, they could not be prevented from revealing information about the case. In reaching this conclusion the Court said: "Once a public hearing had been held, what transpired there could not be subject to prior restraint." *Id.* at 311. The Court added:

> The court below found the rationale of these decisions to be inapplicable here because a state statute provided for closed juvenile hearings unless specifically opened to the public by court order and because "there is no indication that the judge distinctly and expressly ordered the hearing to be public." We think *Cox* and *Nebraska Press* are controlling nonetheless. Whether or not the trial judge expressly made such an order, members of the press were in fact present at the hearing with the full knowledge of the presiding judge, the prosecutor, and the defense counsel. No objection was made to the presence of the press in the courtroom or to the photographing of the juvenile as he left the courthouse. There is no evidence that petitioner acquired the information unlawfully or even without the State's implicit approval. The name and picture of the juvenile here were "publicly revealed in connection with the prosecution of the crime," 420 U.S., at 471, ... much as the name of the rape victim in *Cox Broadcasting* was placed in the public domain. Under these circumstances, the District Court's order abridges the freedom of the press in violation of the First and Fourteenth Amendments.

*Id.* at 311–312.

Next, in *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97 (1979), the Court reviewed a West Virginia statute that made it a crime for a newspaper to publish the name of any youth charged as a juvenile offender, without written approval of a juvenile court. The statute provided for criminal sanctions for violation of this statute. The press urged the Court to hold that because the statute requires juvenile court approval prior to publication of a juvenile's name, it operated as a prior restraint on speech. The Court said: "The resolution of this case does not turn on whether the statutory grant of authority to the juvenile judge to permit publication of the juvenile's name is, in and of itself, a prior restraint. First Amendment protection reaches beyond prior restraints." *Id.* at 101. The Court then held that regardless of whether the statute was deemed a prior restraint or a penal sanction for the publication of lawfully obtained information, only a state interest of the highest order could justify such a drastic infringement. The Court concluded: "If

the information is lawfully obtained, as it was here, the state may not punish its publication except when necessary to further an interest more substantial than is present here." *Id.* at 104. The Court noted that the only interest advanced by the State as justification for the statute was to protect the anonymity of the juvenile offender. The Court stated that while that was an important interest, it was not sufficient to justify application of criminal penalties, and it did not satisfy constitutional requirements.

None of these decisions by the United States Supreme Court precisely deals with the issues facing this court today, but they provide some guidance. The net cast by Judge Zimmerman's gag order on photography is very wide indeed. It includes Nichols, Sergeant Lovett, their families, and "any juvenile entering or leaving the Courts Building." The physical boundaries of the order are also considerably broad. The order's scope includes not only the courtroom and the courthouse but pictures taken outside of the courthouse as well. And the May 20 oral gag order, which was entered on June 2, appears to differentiate between adults and juveniles. That order precludes pictures of juveniles entering or leaving the Courts Building but prohibits publication of the photographs of the families of Nichols and Sergeant Lovett "in any manner."

Judge Zimmerman made clear in open court the reasoning behind her gag order at the May 25 contempt hearing. She correctly observed that one purpose behind the Arkansas Juvenile Code is to maintain the confidentiality of the juvenile. A second goal is rehabilitation of the juvenile whenever appropriate. She alluded specifically to Ark. Code Ann. § 9-27-348 (Repl. 1998), which reads:

> No information whereby the name or identity of a juvenile who is the subject of proceedings under this subchapter may be ascertained shall be published by the news media without written order of the juvenile court.

The judge further relied on Administrative Order Number 6 of this court, which prohibits photography in juvenile court and which authorizes judges to decide whether photographs in "areas immediately adjacent" to the courtroom would distract participants and impair the dignity of proceedings. Finally, the judge observed that she could have closed the juvenile proceedings to the public and the

media altogether but chose instead to open the Nichols detention hearing under her authority set out in Ark. Code Ann. § 9-27-325(i) (Repl. 1998). That statute reads:

> (2) All other hearings may be closed within the discretion of the court, except that in delinquency cases the juvenile shall have the right to an open hearing and in adoption cases the hearings shall be closed as provided in the Revised Uniform Adoption Act, § 9-9-201 et seq.

Ark. Code Ann. § 9-27-327(i)(2) (Supp. 1999). Her gag order, she stated, was narrowly tailored to balance the constitutional rights of the public and media against the rights of Nichols under the Arkansas Juvenile Code. Her order, she noted, was limited to photographs of the juvenile, Nichols, and Lovett as well as the families of Nichols and Lovett entering and leaving the courtroom and courthouse.

We do not disagree with Judge Zimmerman that confidentiality and rehabilitation are two overarching themes in the Juvenile Code. Our concern, nevertheless, is whether her gag orders went beyond the bounds of what was necessary under the facts of this case. We observe in this regard that the media does not contend in this case that § 9-27-348 of the Juvenile Code, which permits dissemination of the name and identity of a juvenile only by written order of the juvenile judge, is unconstitutional as a prior restraint of the media. Nor does it appear to contest Judge Zimmerman's authority under our Administrative Order Number 6 to protect participants in proceedings and to preserve the dignity of proceedings in areas immediately adjacent to the courtroom. What the media does take issue with is the proscription against "taking photographs in public places, including but not limited to public sidewalks and public streets."[1] This leaves somewhat murky the question of whether the media is raising the issue of pictures taken in the courthouse but not immediately adjacent to the courtroom.

In any case, two critical points decide the issue of prior restraint in the estimation of this court. The first critical point is that the juvenile proceedings were open to the public and media on May 18 and May 20. The proceedings were then ordered closed on May 25, but ordered open to the public and media by the June 6

---

[1] Media Petition For Mandamus, p. 11.

court order at the request of Nichols. Judge Zimmerman, as she acknowledged, could have closed the proceedings altogether under her statutory authority, but she chose not to do so, at least for most of the time in question. The second critical point is that the photograph of Nichols published before the May 18 gag order could not be restrained, as the judge correctly stated in her May 20 modified order. This means a photograph of Nichols as well as his identity and family were in the public domain prior to the judge's order to the contrary. Thus, the proverbial bell had been rung, so to speak, and could not be unrung. The statutory policy prohibiting revelation of the name and identity of the juvenile had already been thwarted. In short, the combination of the fact that the juvenile proceedings had been open to the public and the media, and a photograph of Nichols had already been published with other identifying information lead this court to conclude that the state policy in favor of confidentiality had already been substantially undermined. No one contests the initial publication of Nichols's name and photograph before the first gag order on May 18, and we must conclude that it was information that was lawfully obtained. Under such circumstances, there appears to be no overriding state interest at stake to justify restraining the media from taking additional photographs of Nichols.

■ That leaves this court with the issues of the other juveniles, the victim, and the families as well as whether the media can be restrained from taking photographs of all identified persons in "public places." We admit to some question as to what the category of "any juveniles" encompasses and whether "families" includes more than the immediate families of Nichols and Lovett. The media, however, does not appear to contest the scope of "any juveniles," and we will not address it. Suffice it to say, that gag orders must be narrowly tailored and "any juveniles" appears to be ill-defined. We agree with the media, however, that "families" is less than precise, and we direct Judge Zimmerman to address this category of persons more specifically.

■ With regard to public places, we conclude that Judge Zimmerman has the authority to exclude photographs in areas immediately adjacent to her courtroom under Administrative Order Number 6 for the purposes already stated. The scope of Administrative Order Number 6, however, does not include public streets and sidewalks outside of the courthouse. The media contest the

breadth of the gag order in prohibiting these photographs in public places. The Seventh Circuit Court of Appeals has had occasion to address an order of similar scope. In *Dorfman v. Meisgner*, 430 F.2d 558 (7th Cir. 1970), the Court of Appeals held that a court rule prohibiting photographs in the courtroom "and its environs," which embraced the plaza and sidewalks of the building, violated the First Amendment. We agree with this reasoning and hold that the gag order was too pervasive in its scope. Surely, the juvenile judge must protect participants in her proceedings from harassment and maintain the dignity of her court. But once the juvenile proceedings have been opened to the public, we discern no overriding state interest that would warrant an injunction against photographing Nichols and the others entering or leaving the courthouse.

We emphasize that the facts of this case do not involve a closing of the juvenile proceedings by the juvenile judge and a gag order issued by the juvenile judge prior to the first publication of the juvenile's photograph and other vital information. Those circumstances are simply not before us. We hold, however, that under the facts of this case, the judge's order was too broad and constituted a prior restraint of the media. Because we hold as we do, we need not reach the issue of prior notice to the media before the issuance of the gag order.

The breadth of the gag order leads us to conclude that the judge's order is a plain, manifest, clear, and gross abuse of discretion. We issue a writ of *certiorari* to Judge Zimmerman and direct that she revise her order of May 20, 2000, which was entered on June 2, 2000, in accordance with this opinion.

THORNTON, J., not participating.