The Honorable Sam Ledbetter State Representative 324 Charles Street Little Rock, Arkansas 72205-4304
Dear Representative Ledbetter:
I am writing in response to your request for an opinion on the constitutionality of Section 6 of Act 635 of 2001. That act is entitled "An Act to Levy a Quality Assurance Fee Upon Nursing Facilities; and for Other Purposes." Section 6 provides that: "The nursing facility shall not list the quality assurance fee as a separate charge on the billing statement to its patients because the quality assurance fee's calculation is based in part on the aggregate annual gross receipts of the nursing facility." You seek ". . . a determination of whether this provision is constitutional under Article 2, Section 6 of the Constitution of Arkansas and/or the First Amendment to the United States Constitution." You also state that "[o]ne of our most fundamental rights is to free expression and this provision appears to unconstitutionally restrict a nursing facility from exercising this constitutional right."
RESPONSE
There is little case law on the Arkansas constitutional provision about which you inquire. It is difficult to state with certainty, therefore, whether Section 6 of Act 635 violates Arkansas Constitution, art. 2, §6. It appears that the Arkansas Supreme Court has treated this constitutional provision as co-extensive with the First Amendment. With respect to the First Amendment issue, determining the proper test to apply, either the one for regulation of "commercial speech," or the one for regulation of "pure speech," will be important. At least one federal district court granted a preliminary injunction against enforcement of a law similar to Section 6 of Act 635, even under the more lenient test applied to "commercial speech." The facts relating to Act 635 are at least somewhat distinct from those before the federal district court, however, and the ultimate issue may turn upon the importance of the legislature's asserted interest in restricting the speech and the reasonableness of the legislation's "fit" to this asserted interest. These are to some degree questions of fact that cannot be fully developed in the context of an Attorney General's opinion. I have set out the relevant law below and have indicated the factors that might bear upon the analysis.
As an initial matter, a brief synopsis of the act in question is necessary to lay a foundation for the application of the law set out below.
Act 635 of 2001 levies a "quality assurance fee" on nursing facilities in "an amount determined each month by multiplying the patient days as reported by each nursing facility for each day of the month by [a] multiplier." Acts 2001, No. 635, § 2(b)(1). The "multiplier" is "[c]alculated by the division [of Medical Services at the Department of Human Services] to produce an aggregate annual quality assurance fee payment equal to six percent (6%) of the aggregate annual gross receipts; and [s]ubject to prospective adjustment as necessary for annual aggregate quality assurance payments to equal six percent (6%) of the aggregate annual gross receipts." Id. at § (b)(2)(A) and (B). On and after July 1, 2001, and annually thereafter the multiplier shall be determined using the patient days and gross receipts reported to the division for a period of at least six (6) months and shall be annualized." Id. at § (c)(2)(A).[1]
Again, Section 6 of the Act, the section about which you have inquired, prohibits a nursing facility from listing the fee as a separate charge on billing statements "because the . . . [fee] is based in part on the aggregate annual gross receipts of the nursing facility."
In response to your question, I must first point out that it is axiomatic that the legislature possesses all legislative power unless restrained by some provision of the Arkansas or United States Constitutions. See e.g.,Wells v. Purcell, 267 Ark. 456, 592 S.W.2d 100 (1979); Jones v. Mears,256 Ark. 825, 510 S.W.2d 857 (1974) and Black v. Cockrill, Judge,239 Ark. 367, 389 S.W.2d 881 (1965). In addition, legislation is presumed to be constitutional absent a clear conflict with constitutional provisions. See e.g., Teague v. State, 328 Ark. 724, 946 S.W.2d 670
(1997); Pogue v. Cooper, 284 Ark. 105, 679 S.W.2d 207 (1984); Stone v.State, 254 Ark. 1011, 498 S.W.2d 634 (1973); and Buzbee v. Hutton,186 Ark. 134, 52 S.W.2d 647 (1932). If it is possible to construe an act as constitutional, a court not only may, but should and will do so. Love v.Hill, 297 Ark. 96, 759 S.W.2d 550 (1988).
The constitutional provisions you invoke are Arkansas Constitution, art.2, § 6 and the First Amendment to the United States Constitution, which provide, respectively, as follow:
 The liberty of the press shall forever remain inviolate. The free communication of thoughts and opinions is one of the invaluable rights of man; and all persons may freely write and publish their sentiments on all subjects, being responsible for the abuse of such right. In all criminal prosecutions for libel the truth may be given in evidence to the jury; and, if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party charged shall be acquitted. [Emphasis added.]
* * *
 Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the government for a redress of grievances. [Emphasis added.]
The latter provision is applicable as well to the states by virtue of theFourteenth Amendment. Douglas v. City of Jeannette, 319 U.S. 157, 162
(1943); Southeastern Promotions, Ltd. V. Conrad, 420 U.S. 546, 547
(1975).
Although the former provision is sometimes invoked in Arkansas cases, it is often subordinated in favor of reliance on United States Supreme Court case law interpreting the First Amendment. See e.g., ArkansasDemocrat-Gazette v. Zimmerman, 341 Ark. 771, 20 S.W.3d 301 (2000) andEaton v. Supreme Court Committee on Professional Conduct, 270 Ark. 573,607 S.W.2d 55 (1980). I have not found any express discussion by an Arkansas court of whether this provision is indeed co-extensive with theFirst Amendment or whether it might, rather, be construed to providemore protection than that Amendment. See, however, Op. Att'y Gen. No.98-017 (stating that "[t]his provision has not been interpreted to provide any greater general protection than is provided by the U.S. Constitution); and Op. Att'y Gen. 90-221 (opining that art. 2, § 6 would be construed co-extensively with the First Amendment for determining the existence of a "public forum" for initiative signature collecting).
Other states with similar constitutional language are not entirely in agreement as to whether such state provisions are construed co-extensively with the First Amendment. See e.g., State v. Wickland,589 N.W.2d 793 (Minn. 1999) (declining to interpret similar language more broadly so as to afford free speech rights on private property); Statev. Russell, 227 Kan. 897, 610 P.2d 1122 (1980) (stating that the two constitutional provisions (the First Amendment and Kansas' similar free speech provision) are generally considered co-extensive," citing State v.Motion Picture Entitled "The Bet," 219 Kan. 64, 72, 547 P.2d 760
(1976)); and Pines v. Tomson, 160 Cal. App.3d 370, 206 Cal. Rptr. 866
(1984) (relying on an 1896 case, Dailey v. Superior Court, 112 Cal. 94,44 P. 458, to interpret California's similar language as granting broader protection than the First Amendment affords).
Additionally, I have found no helpful Arkansas cases delineating the independent scope of the protection afforded by the pertinent language of art. 2, § 6 ("The free communication of thoughts and opinions is one of the invaluable rights of man; and all persons may freely write and publish their sentiments on all subjects.") At least one court has held that the word "sentiments" is important in the construction of such a provision and that, based upon the definition of that word, "it is plain that the `sentiments' to which [such provisions] refer include statements of editorial thought, emotion and opinion." See Pines v.Tomson, supra at 882. This construction may militate against art. 2, § 6 protection for the billing statement itemization that is the subject of Section 6 of Act 635.
In any event, with the dearth of Arkansas case law, it is difficult to determine the resolution of the state constitutional law issue.
Turning to the First Amendment issue, I have found one similar federal case that is somewhat helpful in framing at least the preliminary issues. In Bloom v. O'Brien, 841 F. Supp. 277 (D. Minn. 1993), a number of health care providers sought a preliminary injunction to prevent enforcement of a Minnesota statute that prohibited health care providers from itemizing a gross revenue tax on a patient's bill. The Minnesota statute imposed a two percent tax on the "gross revenues" of health care providers and allowed the providers to pass the tax along to consumers and insurance companies. The statute, however, stated that the provider "must not separately state the tax obligation . . . on bills provided to individual patients." Id. at 278, 279. The providers alleged that this restriction on itemization violated their First Amendment right of freedom of speech. The court agreed that the providers were "likely to prevail on the merits," and granted a preliminary injunction against enforcement of the statute. Id. at 283.
The initial issue the court in Bloom faced was which constitutional test to apply, stating that: "[i]t is well established that "pure" speech is entitled to greater protection than is "commercial" speech." Id. at 280,citing Central Hudson Gas Electric Corp v. Public Service Commissionof New York, 447 U.S. 557, 563 (1980). The "common sense distinction" between commercial speech and pure speech, the court noted, is that commercial speech "proposes a commercial transaction." City of Cincinnativ. Discovery Network, Inc., 507 U.S. 410 (1993). The court found that the "common sense distinction," however, "breaks down" in the case before it, stating that "[b]ecause this charge is not imposed by the state on the particular transaction, but is a consequence of the gross revenue tax law, stating the amount charged to individual patients may well be construed as a political statement about what is owed. Thus, the proscribed speech may be political speech." Id. at 281.[2] The court did not conclusively determine this issue, however, and "defer[ed] deciding until a trial on the merits." Id. The court then proceeded to analyze the law under the more lenient test for "commercial speech."
The proper analysis of a commercial speech issue involves a four-step process. First, for commercial speech to come with the protection of theFirst Amendment it must concern lawful activity and not be misleading. Second, the court determines whether the asserted governmental interest is substantial. Third, if both inquiries yield positive answers, the court determines whether the statute directly advances the governmental interest asserted, and fourth, whether the statute is not more extensive than is necessary to serve that interest. Lorillard Tobacco Co. v.Reilly, ___ U.S. ___, 121 S.Ct. 2404, 2421 (June 28, 2001). This last step does not require the least restrictive means available, but only a "reasonable fit" between the legislature's ends and the means chosen.Id.
The district court in Bloom found that the speech came within the protection of the First Amendment under the first step, in that the speech concerned a lawful activity and was not misleading. The court noted that passing on the tax to consumers was undoubtedly lawful. Id. at 281. The court also rejected the state's assertion that the speech would be "misleading" because it would lead consumers to believe the tax at issue was a "sales tax," concluding that "[a] bill which accurately states the amount and the nature of the charge is not inherently misleading." Id. at 282. Under the second step in the analysis the court found that the state's asserted interest, which was to prevent the dissemination of misleading information, was substantial. (The state asserted that the speech would lead consumers to believe that they were being taxed on the transaction for which they were being billed. The plaintiffs, on the other hand, asserted that the regulation was "simply a cynical attempt by the legislature to avoid responsibility for creating a new tax." Id. at 283.) Having answered the first two inquiries in the affirmative, the court went on to address the third step in the analysis. The court found that the restriction on speech failed this part of the test, stating "if the state's interest is in preventing the dissemination of false information, then the statute fails . . . this step . . . because it is likely to be ineffective. The statute apparently allows health care providers to tell consumers anything they wish about the gross revenue tax, except the itemized amount of the tax that the consumer is required to pay as part of a medical bill. This is hardly an effective means to accurately convey the information which is of most concern to individual consumers, that is, the amount of money which the consumer is paying to offset the health care provider's gross revenue tax." Id. At 282. The court also found the statute violative of the fourth step in the analysis in that it was "substantially excessive" and not "proportional to the state's interest." The court stated that: ". . . the total prohibition on informing the individual consumer of the amount of the health care provider's tax which is being passed along to that consumer prevents the disclosure of information which that consumer would want to receive and the health care provider would want to provide. Given the political overtones of such information, health care providers may have an incentive to insure that consumers are accurately informed that the tax they are being asked to share is a new tax, rather than the sales tax to which the public may be accustomed." Id. at 282-283. The district court therefore concluded that the plaintiff health care providers were "likely to succeed on the merits" of their case for purposes of granting a preliminary injunction.
Application of this four-step analysis to Section 6 of Act 635 is necessary to determine the constitutionality of the provision, at least under the more lenient test for "commercial speech." In my opinion, the speech at issue (the itemization of the tax on billing statements), meets the first part of the test, in that it concerns a lawful activity and is not misleading. It is therefore within the protection of theFirst Amendment. The second part of the test (that the state's asserted interest be substantial) is in my opinion met as well. That interest is presumably to protect the confidentiality of gross receipts of nursing facilities. See Acts 2001, No. 635, § 6 (a "facility shall not list the . . . fee . . . as a separate charge . . . because the . . . fee's calculation is based in part on the aggregate annual gross receipts of the nursing facility.") The crucial part of the analysis, as in Bloom
above, will therefore focus on the third and fourth steps in the analysis, which involve whether the regulation directly advances the governmental interest, and whether there is a "reasonable fit" or proportionality between the government's interest and the regulation. In my opinion the resolution of these issues will require an analysis of fact, which is not possible in the format of an Attorney General's opinion. I can set out, however, some of the factors that may be relevant in the analysis.
The concern under the third step is in essence the extent to which Section 6 of the act will be effective in accomplishing its objective. Here, the asserted objective is to protect the confidentiality of nursing facility revenue information. If this is the asserted state interest, a relevant concern under this step is to what extent the billing itemization would reveal this information. I cannot determine, however, from a bare review of the legislation, to what extent the itemization would betray the gross revenues of the facility. This would require the development of facts. The extent to which such billing itemization would reveal the facility's gross receipts will bear upon whether the restriction on speech "directly advances the governmental interest."
Another relevant consideration, given the asserted state interest in confidentiality, is to what extent nursing home facility revenue information is otherwise open to public inspection. If gross receipts information of nursing facilities is already a matter of public record, it would be difficult to conclude that the billing restriction "directly advances" the governmental interest in confidentiality. To the extent the information is not otherwise public, however, the statute may stand in more reasonable constitutional stead. I cannot determine this issue as a matter of law, however, in all cases. Act 635 requires certain reporting of "gross receipts" information to the Division of Medical Services. See
Acts 2001, No. 635, § 2(c)(2)(A). The confidentiality of such information is not specifically addressed in Act 635 and I cannot determine as a matter of law whether it would be available from the Department of Human Services under the Arkansas Freedom of Information Act (A.C.A. §25-19-101 to -109) or exempt by the provisions of that Act or some other legal provision. Cf. A.C.A. § 25-19-105(9)(A) (the "competitive advantage" exemption to the FOIA); §§ 20-10-210, as amended by Act 1774 of 2001; and 20-10-228 (each making confidential the identity of long-term care facility residents, their families, or complainants from records information received by the Office of Long Term Care and the Department of Human Services, respectively). I will note, however, that to the extent the quality assurance fee applies to public or nonprofit nursing facilities, information on the gross receipts of these entities may already be public. See e.g., A.C.A. §§ 25-19-101 to -109, supra (the "FOIA") (as to facilities subject to its provisions); and26 U.S.C. §§ 6104(d) and 6033 (as to § 501(c)(3) nonprofit entities).
This last point may also be relevant in the fourth step in the analysis (the "fit" between the government interest and the regulation). To the extent the restriction on speech is overbroad in prohibiting speech outside the state's asserted interest, it risks being "substantially excessive" under the fourth factor in the analysis. Thus, if Section 6 of Act 635 seeks to protect the confidentiality of some information that is otherwise public, the "fit" of the legislation to its asserted purpose is implicated.
Another relevant concern may be the statute's total prohibition against billing itemization by a nursing facility, even where that facility may wish to disclose whatever gross receipts information is revealed in the process. That is, if the asserted state interest is for the benefit of the facility, to protect the confidentiality of its revenue information, the statute may be overbroad in flatly prohibiting the itemization, rather than making it optional with the facility. A relevant concern under this step, however, may be to what extent the billing information would shed light on the gross receipts of other facilities that would not opt to disclose such information. Again, I cannot determine the excessiveness of the Section 6 in this regard without detailed factual reference to the process by which the fee is calculated.
The resolution of the ultimate issue, therefore, the constitutionality of Section 6 of Act 635, may depend upon resolution of factual issues. I hope the foregoing is helpful, however, in framing the relevant issues.
Senior Assistant Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:ECW/cyh
[1] I cannot determine from a bare review of the legislation the exact method of calculation of the fee and how its itemization on a resident's bill would reveal a facility's aggregate annual gross receipts. This would require factual development in an adversary proceeding and detailed reference to any rules and regulations promulgated by the Division of Medical Services. See Acts 2001, No. 635, § 4(b)(1).
[2] "When a law burdens core political speech, [the U.S. Supreme Court] appl[ies] `exacting scrutiny' and . . . uphold[s] the restriction only if it is narrowly tailored to serve an overriding state interest." McIntyrev. Ohio Election Commission, 514 U.S. 334, 347 (1995).