Cite as 2025 Ark. 91

# SUPREME COURT OF ARKANSAS

**No.** CR–25–66

| | |
|---|---|
| AARON SPENCER <br><br> PETITIONER <br><br> V. <br><br> STATE OF ARKANSAS <br> RESPONDENT | **Opinion Delivered:** May 29, 2025 <br><br> PETITION FOR WRIT OF CERTIORARI TO THE LONOKE COUNTY CIRCUIT COURT [NO. 43CR-24-551] <br><br> HONORABLE BARBARA ELMORE, JUDGE <br><br> <u>PETITION FOR WRIT OF CERTIORARI GRANTED; WRIT ISSUED; CIRCUIT COURT'S GAG ORDER VACATED</u>. |

**COURTNEY RAE HUDSON, Associate Justice**

Aaron Spencer has filed a petition for writ of certiorari requesting that a gag order entered in his Lonoke County Circuit Court criminal case be vacated. He argues that entry of the gag order was a plain, manifest, clear, and gross abuse of discretion and that there is no other adequate remedy but for the writ. We agree, and we grant the petition for writ of certiorari and vacate the circuit court's gag order.

I. *Background*

On November 27, 2024, Spencer was charged by felony information with second-degree murder, along with a firearm enhancement under Arkansas Code Annotated section 16-90-120, for the shooting death of sixty-seven-year-old Michael Fosler. The State alleged that on October 8, 2024, Spencer knowingly caused Fosler's death under circumstances manifesting extreme indifference to the value of human life, a Class A felony under Arkansas

Code Annotated section 5-10-103 (Repl. 2024). The circumstances of the shooting were as follows. In July 2024, Fosler had been charged with numerous sexual offenses against Spencer's teenage daughter, and he was released on bond. On the night of the shooting, Spencer awoke to his dog barking and realized that his daughter was gone. Spencer found a "hoodie" on a stuffed animal placed in her bed. As a result, he left in his truck to search for her. Spencer located Fosler's truck—with his daughter inside—and he forced Fosler's truck off the highway. After an altercation, Spencer called 911 to report that he had shot Fosler. Fosler died at the scene.

On December 4, 2024, the State filed a motion for gag order alleging that Spencer's arrest had garnered media coverage throughout the state and the nation. Attached to the motion was a press release from Spencer's attorneys, Erin Cassinelli and Michael Kaiser, criticizing the decision to charge Spencer criminally as "targeting [a] heroic father." The State also pointed to a television interview in which defense counsel allegedly stated that they felt confident that the community would side with Spencer "because every one of them would have done the same thing for their child or their neighbor's child or member of their family." The State argued that a gag order was necessary to preserve the integrity of the jury pool and to ensure the right of a fair trial for both the State and the defendant. The State proposed eight content-based limitations on the speech of any party; any attorney or agency connected with this case, directly or indirectly; any judicial employee or officer of the court; any public official now holding office, including but not limited to law enforcement officials, their agents, deputies, or employees; and any person subpoenaed to testify in the trial of the case.

2

On December 9, 2024, Spencer filed a detailed response in opposition to the motion for gag order. He argued that granting the motion for gag order would violate his due-process rights to a fair and public trial pursuant to the Sixth and Fourteenth Amendments, as well as his First Amendment right to speak pursuant to both the Arkansas and the United States Constitutions. Spencer requested that a hearing on the State's motion be held in open court.

On December 10, 2024, without holding a hearing, the circuit court entered the order at issue. Noting the "apparent public interest in this case and the [resulting] extensive news media coverage," the court granted the State's motion with some modifications. As grounds for the entry of the order, the court stated: "[I]t appears to the Court that the dissemination by any means of public communication of any out-of-court statements relating to this case may interfere with the rights of the Defendant and the State of Arkansas to receive a fair and impartial trial[.]" The court further noted it was "seek[ing] a fair balance between the constitutional guarantees of a free press." The order implemented the eight prohibitions requested by the State:

> It is the Order of this Court that no party to this action, nor any attorney or agency connected with this case, directly or indirectly, nor any judicial employee or officer of this Court, nor any public official now holding office, including but not limited to law enforcement officials, nor any agent, deputy or employee of any such persons, nor any person subpoenaed to testify at the trial of the case[,] [n]either shall the defendant nor his family shall do any of the following[1]:
>
> (1)[R]elease or authorize the release for public dissemination of any purported extrajudicial statement of the Defendant relating to this case;

---

[1]The order included several notations handwritten and initialed by the judge, including the addition of Spencer's family.

3

(2) Release or authorize the release of any documents or exhibits or any evidence, the admissibility of which may have to be determined by the Court;

(3) Make any statement for public dissemination as to the existence or possible existence of any document, exhibit, or any other evidence;

(4) Express outside of the Court an opinion or make any comment for public dissemination as to the weight, value, or effect of any evidence as tending to establish the guilt or innocence of the Defendant;

(5) Make any statement outside of Court for public dissemination as to the weight, value, or effect of any testimony that has been given;

(6) Issue any statement for public dissemination as to the identity of any prospective witnesses, or their probable testimony or the effect thereof;

(7) Make any out of court statement for public dissemination as to the weight, value, source, or effect of purported evidence alleged to have been accumulated as a result of the investigation of this matter;

(8) Make any statement for public dissemination as to the content, nature, substance, or effect of any testimony which may be given at any proceeding related to this matter with any attorney of record or any agent thereof.

This Order does not include:

(1) Factual statements of the Defendant's name, age, residence, occupation, or family status;

(2) The circumstances of the arrest, namely the time and place of arrest, the identity of the arresting and investigating officers and agencies, and length of the investigation;

(3) The nature, substance, and text of the charges, including a brief description of the offense(s) charged;

(4) Quotations from, or any reference without comment to, public records of the Court in this case, or to other public records or communications heretofore disseminated to the public;

(5) The scheduling and result of any stage of the judicial proceeding held in open court or in an open public session;

(6) Any request for assistance in obtaining evidence;

(7) Discussion by any witness or prospective witness of any matter in connection with the case with any of the attorneys representing the Defendant or the State.

All parties and the defendant [are] under a Gag Order.

The order goes on to require (1) that a copy of the order be attached to any subpoena served on any witness in this matter and (2) redaction of any information violating the gag order from any paperwork related to the case that might be disseminated to the public. The order further states that it will "be in force until this case has been disposed of, or until this Court orders otherwise. This Order will help ensure all parties get a fair trial." Finally, the order provides that "[t]he entire case is now sealed." Thus, the circuit court adopted the requested prohibitions contained in the State's motion for gag order, with the qualifications listed in provisions (1)–(7) and the sua sponte sealing of "the entire case."[2]

On February 2, 2025, Spencer filed in this court a petition for writ of certiorari and for other relief. The State filed a response on February 12, and Spencer later filed a motion to stay proceedings in the circuit court, take the petition as a case, and set a briefing schedule pursuant to Arkansas Supreme Court Rule 6-1(f) (filing briefs in petitions for extraordinary

---

[2]We note that this order is nearly identical to the orders we vacated without written opinion in *Arkansas Democrat-Gazette, Inc. v. State of Arkansas*, CV-20-517 (petition for writ of certiorari granted). Although the present order does not expressly apply to media outlets, the eight prohibitions on speech and the seven provisions for information not prohibited by the order use the same language as in the *Arkansas Democrat-Gazette* gag orders (styled "orders regarding publicity"). Arkansas courts shall no longer use this apparent form order.

5

writs). Spencer also requested oral argument. We granted Spencer's motion to stay proceedings in the circuit court, took the petition for writ of certiorari as a case, set a briefing schedule, and granted Spencer's request for oral argument. The petition is now ripe for decision.

## II. *Standard for Issuing a Writ of Certiorari*

A writ of certiorari is extraordinary relief. *S. Farm Bureau Cas. Ins. Co. v. Parsons*, 2013 Ark. 322, at 5, 429 S.W.3d 215, 218. Two requirements must be satisfied in order for this court to grant a writ of certiorari. *Id.* First, a writ of certiorari lies only when (1) it is apparent on the face of the record that there has been a plain, manifest, clear, and gross abuse of discretion, or (2) there is a lack of jurisdiction, an act in excess of jurisdiction on the face of the record, or the proceedings are erroneous on the face of the record. *Id.* Second, there can be no other adequate remedy but for the writ of certiorari. *Id.* This court has held that a writ of certiorari is the appropriate remedy when a prior restraint on speech is a plain, manifest, clear, and gross abuse of discretion. *See Ark. Democrat-Gazette v. Zimmerman*, 341 Ark. 771, 779, 20 S.W.3d 301, 305 (2000).

## III. *Analysis*

Spencer argues that the gag order violates the First Amendment because it is an unjustified prior restriction on certain content-based categories of speech. He further argues that the circuit court exceeded its jurisdiction when it placed overbroad restrictions on the speech of nonparties without due process. The State responds that the circuit court's order was within constitutional limits, protects the integrity of this case, and ensures a fair trial for both Spencer and the State. For the reasons that follow, we hold that the circuit court's

6

action in entering the challenged gag order was on its face a plain, manifest, clear, and gross abuse of discretion and in excess of its authority. Further, there is no other adequate remedy except for a writ of certiorari.

## A. Standing

As an initial matter, we must address the State's argument in its response brief that Spencer lacks standing to challenge the order based on the constitutional rights of others. Indeed, as a general matter, constitutional rights are personal rights and may not be raised by a third party. *See Toland v. Robinson*, 2019 Ark. 368, at 6, 590 S.W.3d 146, 150. However, the issues raised in this petition for an extraordinary writ require us to consider restrictions not directed toward Spencer personally, and we decline to uphold any part of the order in light of the order's clear lack of an evidentiary basis as a whole.

Here, the circuit court's order is extremely broad as to the persons restrained from speaking. It restrains the parties; their attorneys; "any public official now holding office," along with their staff; witnesses; court staff; and the defendant's family. The order is also extremely restrictive as to what information is being shielded from public view. It restricts filings and perhaps courtroom proceedings from public view. The order implicates Spencer's right to a public trial as well as the public's right to know how its officials are conducting these criminal proceedings. The State points out that Spencer raises arguments regarding the gag order's application to public officials and to his family, the restriction on public and press access to the court file, and the due-process rights of nonparties as to entry of the order without notice. However, Spencer clearly has standing to bring this petition requesting that

this court vacate the gag order in his criminal case, and we will address Spencer's arguments to the extent necessary to resolve the issues raised in the petition.

## B. Freedom of Speech

The First Amendment to the United States Constitution provides in part, "Congress shall make no law . . . abridging the freedom of speech[.]" The First Amendment is made applicable to the states by the Fourteenth Amendment. Similarly, article 2, section 6 of the Arkansas Constitution provides, "The free communication of thoughts and opinions, is one of the invaluable rights of man; and all persons may freely write and publish their sentiments on all subjects[.]" Spencer relies on both the United States Constitution and the Arkansas Constitution in arguing that the gag order in this case violates his and others' free-speech rights. However, free-speech rights are not absolute and, in rare cases, must yield to the Sixth Amendment's guarantee of a fair trial by an impartial jury. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 551 (1976) (discussing the Sixth Amendment's guarantee of a fair trial by an impartial jury as a basic requirement of due process).

A "gag order" is defined as a "judge's order directing parties, attorneys, witnesses, or journalists to refrain from publicly discussing the facts of a case." *Black's Law Dictionary* 816 (12th ed. 2024). Thus, a gag order is, by definition, a prior restraint on speech. "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n*, 427 U.S. at 559. As such, a prior restraint on speech "bears a heavy presumption against its constitutional validity." *Helena Daily World v. Simes*, 365 Ark. 305, 308, 229 S.W.3d 1, 3 (2006). In fact, the Supreme Court has recognized that criticisms of the state lie at the very center of the First Amendment; this

8

could include speech critical of judges, prosecutors, public defenders, and law enforcement. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1034 (1991). "[I]t would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." *Id.* at 1035 (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980)).

The Supreme Court of the United States has only directly addressed the constitutionality of gag orders as they apply to the press—not as to attorneys, parties, witnesses, or the public. Nor has the Supreme Court articulated a legal standard for when, if at all, such prior restraints would be permissible. In *Nebraska Press*, the Court considered gag orders on the press and strongly disapproved of such prior restraints except in extraordinary circumstances. The Court noted that "pretrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial." 427 U.S. at 565. The Court stated that it was required to determine whether "the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." *Id.* at 562. To do so, the Court examined the evidence before the trial judge when the order was entered to determine the nature and extent of pretrial news coverage; whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity; how effectively a restraining order would operate to prevent the threatened danger; and whether the precise terms of the restraining order were too broad or too vague. *Id.* In *Gentile v. State Bar of Nevada*, the Court considered the circumstances under which attorneys may be punished *after* speaking. The Court upheld a prohibition on speech that presents a "substantial likelihood of materially prejudicing an

9

adjudicatory proceeding," as provided for in Nevada's professional-conduct rules. *Gentile*, 501 U.S. at 1033. Importantly, the Supreme Court held that "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press in [*Nebraska Press*]." *Id.* at 1074. *Nebraska Press* and *Gentile* provide guidance but do not answer the question whether or when gag orders may be placed on attorneys, parties, witnesses, or the public in pending cases.

Here, the gag order was intended to address "the need to protect the integrity of the jury pool" to ensure that "all parties get a fair trial" in light of pretrial publicity. When considering pretrial publicity, a trial court has the difficult job of balancing constitutional interests while upholding its affirmative duty to protect the integrity of the criminal-justice process. The Supreme Court made this clear in *Sheppard v. Maxwell*, 384 U.S. 333 (1966), when it granted habeas relief to a petitioner who had been deprived a fair trial in his state murder conviction because of the trial judge's failure to protect him from "massive, pervasive, and prejudicial" publicity and from the "carnival atmosphere" at the trial itself. The *Sheppard* Court noted that "the trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters." *Sheppard*, 384 U.S. at 361. We recognize that *Sheppard* was an extreme case in which there was no doubt that the "deluge of publicity reached at least some of the jury." *Id.* at 357. The Court ultimately concluded that Sheppard had not received a fair trial consistent with the Due Process Clause of the Fourteenth Amendment and reversed his conviction. While intense publicity can prejudice a trial, we note that "[a]n impartial jury . . . need not be wholly unaware of information—including potentially prejudicial

10

information—outside the record." *In re Murphy-Brown, LLC*, 907 F.3d 788, 798 (4th Cir. 2018).

We now turn to the arguments regarding which standard should apply to a prior restraint on speech in the context of this case. To justify a prior restraint on free speech, there must first be a factual showing of necessity. In other words, this court must determine whether the circuit court's order is justified by a sufficient risk of material prejudice to an ongoing judicial proceeding. This court has explained: "[T]he question becomes whether the justifications for the restraining order . . . are of sufficient weight to eclipse the substantial weight of the interests protected by the First Amendment, which dictate the heavy presumption against the constitutional validity of prior restraints." *Helena Daily World*, 365 Ark. at 309, 229 S.W.3d at 4; *see also Nebraska Press*, *supra* (discussing test for justification of invasion of free-speech rights). What, then, is the necessary showing? Spencer argues that a gag order is permissible only under the highest level of scrutiny, that is, if there is a serious and imminent threat to the administration of criminal justice. In contrast, the State relies on *Gentile* and argues in favor of a heightened standard that is less rigorous than strict scrutiny.

In the absence of Supreme Court precedent, the federal circuits and the states have taken different approaches to gag orders. Some courts have adopted the "clear and present danger" or "serious and imminent threat" standard. *See United States v. Ford*, 830 F.2d 596, 598 (6th Cir. 1987) (requiring a serious and imminent threat to restrain the speech of a criminal defendant); *Levine v. United States District Court*, 764 F.2d 590, 595 (9th Cir. 1985) (requiring either a clear and present danger or a serious and imminent threat for a prior restraint on attorney speech); *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242, 249 (7th

11

Cir. 1975) (applying serious and imminent threat standard); *United States v. Trump*, 88 F.4th 990, 1027 (D.C. Cir. 2023) ("[W]e hold that some aspects of the defendant's speech pose a significant and imminent risk to the fair and orderly adjudication of this criminal proceeding, which justified protective action by the district court."); *Breiner v. Takao*, 835 P.2d 637, 641 (Haw. 1992) ("[E]xtrajudicial statements of attorneys may be subject to prior restraint by a trial court upon a demonstration that the activity restrained poses a *serious and imminent threat* to a defendant's right to a fair trial and to the fair administration of justice."(emphasis added)); *Johanson v. Eighth Jud. Dist. Ct. of Nev. ex rel. Cnty. of Clark*, 182 P.3d 94, 98 (Nev. 2008) (adopting clear and present danger or serious and imminent threat standard for issuing a gag order in a civil case). Other courts have adopted the "substantial likelihood of material prejudice" standard. *See United States v. Scarfo*, 263 F.3d 80, 94 (3d Cir. 2001); *United States v. Brown*, 218 F.3d 415, 427 (5th Cir. 2000). Still other courts have adopted a "reasonable likelihood" of prejudice standard. *See In re Russell*, 726 F.2d 1007, 1010 (4th Cir.1984); *United States v. Tijerina*, 412 F.2d 661, 666 (10th Cir. 1969); *James v. Hines*, 63 S.W.3d 602, 607 (Ky. Ct. App. 1998) (before entering a gag order restraining trial participants, the court must first determine whether there is a reasonable likelihood that pretrial publicity will prejudice the defendant's right to a fair trial).

When determining which standard to apply, we must initially recognize whose speech is being restricted. We can identify three categories of persons potentially subject to gag orders: (1) attorneys of record; (2) non-attorney trial participants (such as criminal defendants, witnesses, and court staff); and (3) the public at large (*i.e.*, those who are not

12

participating in the trial).[3] Because the gag order entered here included members of all three categories, we review each to establish the appropriate standards.

First, we address attorney speech. The Supreme Court has recognized that speech by an attorney is subject to greater regulation than speech by others. *See Gentile*, *supra*. The Court recognized that states have historically regulated admission to the bar and exercised authority to discipline attorneys; attorneys have access to non-public information and are viewed as authoritative, both of which pose a greater potential risk to the fairness of a trial; and attorneys are officers of the court. *Id.* at 1066. For these same reasons, we find it appropriate to allow greater regulation of attorney speech in the context of a criminal trial than would be permissible for the speech of non-attorney trial participants or members of the public. Thus, we hold that attorneys in Arkansas may be restrained from extrajudicial speech that poses a substantial likelihood of material prejudice to an ongoing criminal proceeding. This is consistent with attorneys' existing obligation under Rule 3.6 of the Arkansas Rules of Professional Conduct regarding trial publicity.

Next, we consider the free-speech rights of non-attorney trial participants. These persons are not subject to the same rules and restrictions as attorneys. But, as participants in the trial, their speech has the potential to have a greater impact than the speech of non-trial participants. *See Sheppard*, 384 U.S. at 363 ("Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the

---

[3]We do not address gag orders on the press in this opinion because the order before us does not impose restrictions on the press, nor does any member of the press challenge it. We note that this court has previously addressed gag orders placing prohibitions on the press. *E.g.*, *Ark. Democrat-Gazette v. Zimmerman*, 341 Ark. 771, 20 S.W.3d 301 (2000).

court should be permitted to frustrate its function.") Thus, we conclude that free-speech protections for non-attorney trial participants are greater than those of attorneys of record but less than those of the public at large. Therefore, we hold that the speech of non-attorney trial participants may be restrained only to the extent that it poses a serious and imminent threat of material prejudice to an ongoing criminal proceeding.

Finally, we address prior restraints on the public, whose speech is afforded the most protection in the context of gag orders. Restraining the speech of the public raises obvious issues regarding lack of due process. We cannot fathom why the circuit court believed it could prohibit the speech of "any public official now holding office." In fact, it is difficult to foresee any circumstance in which a prior restraint on the speech of a member of the public, which would include a public official, could be constitutional.

Having established the legal standards to be applied, we turn to the additional findings a circuit court must make in every case to justify the entry of a gag order restricting the speech of any individual. First, the circuit court must determine whether alternative measures would protect the parties' right to a fair trial. *See Nebraska Press*, *supra*. Here, Spencer suggests that extensive voir dire of prospective jurors, using an expanded jury pool, giving cautionary instructions, changing venue, or postponing the trial are alternatives that should be considered before restraining speech, but the circuit court heard no evidence and made no findings in this regard. In addition, the circuit court must find that a gag order would be likely to accomplish the goal of preventing prejudice to the proceedings. *See Nebraska Press*, *supra*. Again, there was no such finding in this case. Finally, a gag order must be narrowly tailored to prohibit only what is necessary to protect the integrity of the

14

ongoing judicial proceedings. *E.g.*, *Gentile*, 501 U.S. at 1075. In other words, the restrictions imposed must not be overly broad. Here, many of the prohibitions on speech listed in the gag order were overly broad. For example, prohibiting the public expression of an opinion as to "the weight, value, or effect of any evidence as tending to establish the guilt or innocence of the [d]efendant" by any public official is clearly overbroad.

In sum, before entering a gag order, a circuit court must specifically find, based on evidence in the record, that (1) the prospectively limited speech would pose a sufficient threat of material prejudice to an ongoing criminal proceeding, depending on whether the limitation applies to attorneys of record, non-attorney trial participants, or members of the public; (2) after consideration of alternative less restrictive measures, none would sufficiently protect the parties' right to a fair trial; (3) the prohibitions would be likely to prevent material prejudice to the proceedings; and (4) the prohibitions are narrowly tailored to prohibit only what is necessary to prevent material prejudice to the ongoing proceedings.

## C. Due Process – Vagueness and Overbreadth

Spencer also argues that the order is impermissibly vague and that it is impossible to know what is covered by some of its provisions. He states that it is unclear, for example, whether statements on social media are restricted or must be removed; whether previously public filings now removed from public access may be shared; what "for public dissemination" means; and precisely who this gag order restrains. Spencer also argues that it is unclear what, exactly, prohibition number 8 seeks to restrict. According to that provision, the named individuals cannot "[m]ake any statement for public dissemination as to the content, nature, substance, or effect of any testimony which may be given at any proceeding

15

related to this matter with any attorney of record or any agent thereof." The State, of course, maintains that the gag order is not unconstitutionally vague.

The void-for-vagueness doctrine addresses at least two connected but discrete due-process concerns: Regulated parties should know what is required of them so they may act accordingly; and precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way. *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012). Stated differently, the prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement. *Gentile*, 501 U.S. at 1051. Vague prohibitions also create a chilling effect on speech because one does not know precisely what speech is prohibited. Here, we agree that the gag order is unconstitutionally vague and must be vacated. For example, who is included as part of Spencer's "family"? Does the order purport to restrain the speech of his second cousin or only that of his parents, spouse, and children? Due process requires more specificity.

In his petition for writ of certiorari, Spencer does not develop his due-process argument regarding overbreadth, but in briefing, he clarifies his assertion that the circuit court exceeded its jurisdiction when it placed overbroad restrictions on the speech of nonparties without due process. It is unnecessary to address overbreadth as a due-process violation in this case. Our decision is governed by the free-speech and void-for-vagueness analysis above.

D. Sealing the Case

Finally, we address the circuit court's decision to seal the case. Spencer contends that the community has a right to know what its government does in public court proceedings.

He cites Arkansas Code Annotated section 16-10-105 (Repl. 2010), which provides: "The sittings of every court shall be public, and every person may freely attend the sittings of every court."[4] Here, after the court's order was entered, the case filings were removed from public view. The inherent authority to seal parts of court files is tempered by the requirements that a request to seal part of a file must be particularized, that there must be some good cause for sealing part of a file, such as a trade secret, and that it should be in effect for only so long as is necessary to protect the specified interest. *Ark. Dep't of Hum. Servs. v. Hardy*, 316 Ark. 119, 124, 871 S.W.2d 352, 355–56 (1994).

Not only are the written records inaccessible to the public, but also, the briefs and statements from counsel at oral argument indicate that the Lonoke County Circuit Court's courtroom was at least partially closed to the public during Spencer's arraignment. Although it appears the circuit court intends to close further proceedings to the public, we caution the court from doing so without an evidentiary basis and adherence to the required constitutional analysis set out in *Waller v. Georgia*, 467 U.S. 39 (1984). *See Mitchell v. State*, 2019 Ark. 67, at 5, 567 S.W.3d 838, 841. As we stated in *Schnarr v. State*, 2017 Ark. 10, "[t]he right to a public trial is one of the most important safeguards in the prosecution of persons accused of crime." *Schnarr v. State*, 2017 Ark. 10, at 11−12 (quoting *Sirratt v. State*, 240 Ark. 47, 53, 398 S.W.2d 63, 66 (1966)).

---

[4]This court has recognized that an accused may assert his constitutional right to a public trial by arguing that exclusion of the news media and the public violates that right. *See Taylor v. State*, 284 Ark. 103, 679 S.W.2d 797 (1984).

## IV. *Conclusion*

The circuit court's gag order is far too broad and too restrictive of speech protected by the First Amendment and article 2, section 6 of the Arkansas Constitution. It is also impermissibly vague. Further, the order was entered without the requisite findings discussed above and wholly without a factual basis. Therefore, we hold that the circuit court's order constitutes a plain, manifest, clear, and gross abuse of discretion for which there is no other adequate remedy; accordingly, we issue a writ of certiorari and vacate the order. By this ruling, we do not foreclose the possibility that, after an evidentiary hearing, the circuit court may issue a subsequent gag order narrowly tailored to specific factual findings supported by the record. However, we emphasize that a gag order "should be a last resort, not a first impulse." *In re Murphy-Brown, LLC,* 907 F.3d at 800.

Petition for writ of certiorari granted; writ issued; circuit court's gag order vacated.

WOOD, WOMACK, HILAND, and BRONNI, JJ., concur.

**RHONDA K. WOOD, Justice, concurring.** Aaron Spencer argues that the judicial gag order violates both the United States Constitution and the Arkansas Constitution. He is correct that it violates the Arkansas Constitution. I write separately because, as a matter of the state-primacy doctrine, I believe we should resolve this case under the Arkansas Constitution before resorting to application of the U.S. Constitution. The test adopted by the majority is appropriate to apply under the Arkansas Constitution as explained below.

There are strong reasons to stick to state constitutional law in cases like this one. First, our role as stewards of the Arkansas Constitution is best honored by examining and interpreting it instead of the U.S. Constitution. There is underdevelopment of many state

18

constitutional issues, and we do Arkansans a disservice by avoiding the Arkansas Constitution to focus on the federal one.[1] When states cede to the federal, it creates the possibility of states being a "mere row of shadows."[2] In fact, we encourage litigants to raise Arkansas constitutional arguments, and we should respond accordingly and address those raised arguments when appropriate. This is especially true in an area of law where the United States Supreme Court has yet to set a clear standard. We are addressing gag orders issued in Arkansas courts, and our test should not be subject to the uncertainty of federal law when we can base it on state-law grounds. Why not settle it for Arkansas now and interpret our constitution as giving additional free-speech protection to our citizens? I fully join the majority's test because it is supported under an originalist interpretation of the Arkansas Constitution.

I. *Text & History*

When we interpret a constitutional provision, we begin with the text but determine its plain and ordinary meaning by examining it in light of its history.[3] It is well accepted

---

[1]*Cf.* Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* 2 (2018) ("Our system of dual sovereigns now comes with dual protections against overreaching state and local laws. . . . American lawyers and judges would do well to pay attention to the liberty and property protections in the federal *and* state constitutions and the reasons why the state guarantees often offer a promising source of protection.").

[2]*State v. Bradberry*, 522 A.2d 1380, 1389 (1986) (Souter, J., concurring specially) (writing "[n]owhere is the need greater than in the field of State constitutional law, where we are asked often to confront questions that have already been decided under the National Constitution").

[3]*Protect Fayetteville v. City of Fayetteville*, 2019 Ark. 28, at 5, 566 S.W.3d 105, 109; *see also Bryant v. English*, 311 Ark. 187, 193, 843 S.W.2d 308, 311 (1992) (explaining a court

that we look beyond the words but also as to their public meaning at that time in history.[4]

We may also compare prior versions of our constitution to interpret its meaning.[5]

    A. The Free-Speech and Free-Press Provisions of the Arkansas Constitutions

Protections in the Arkansas Constitution for freedom of speech and of the press date back to the first Arkansas Constitution, which was adopted in 1836. Article 2 provided as follows:

> Sec. 7. That printing presses shall be free to every person; and no law shall ever be made to restrain the rights thereof. The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write and print on any subject -being responsible for the abuse of that liberty.
> Sec. 8. In prosecutions for the publication of papers investigating the official conduct of officers or men in public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence; and in all indictments for libels, the jury shall have the right to determine the law and the facts.

This language is common to other early state constitutions dating back to at least the 1790s.[6] Contrast this with the First Amendment to the Constitution of the United States, "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ."

---

may look to the history of the times of enactment of a constitutional provision to determine its meaning).

    [4]*State v. Scott*, 9 Ark. 270, 271–72 (1849); *see also Gatzke v. Weiss*, 375 Ark. 207, 211, 289 S.W.3d 455, 458 (2008) ("[W]hen engaging in constitutional construction and interpretation, this court looks to the history of the constitutional provision.").

    [5]*See State v. Brown*, 356 Ark. 460, 469, 156 S.W.3d 722, 728 (2004)(stating "a slavish following of federal precedent would render this court's opinions merely a mirror image of federal jurisprudence.").

    [6]As of 1871, the constitutions of twenty-four states (not counting Arkansas) contained one or more of these phrases in their provisions on freedom of speech and of the press. *See* Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 414–17 n.1 (2d ed. 1871).

This highlights that states chose to use language different from that in the federal constitution and that they were understood, at the time, to retain and protect the freedoms of speech and of the press inherent in natural law as developed in the common law.[7]

Arkansas adopted subsequent constitutions, yet these provisions remained virtually unchanged until the fourth Arkansas Constitution was adopted in 1868. There, the language was moved, and the discussion of prosecutions for libel was incorporated into the section on the freedoms of speech and press. The language was overhauled, and that became our current article 2, section 6: [8]

> **Liberty of the press and speech – Libel**. – *The liberty of the press shall forever remain inviolate. The free communication of thoughts and opinions is one of the invaluable rights of man; and all persons may freely write and publish their sentiments on all subjects, being responsible for the abuse of such right.* In all criminal prosecutions for libel, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true and was published with good motives and for justifiable ends, the party charged shall be acquitted.

(Emphasis added.) In its current form, the Arkansas provision is quite different from its federal counterpart, which allows us to interpret it differently.

## II. *Analysis & Conclusion*

Next, we evaluate the text in its historical context. Early on, our courts recognized that free-speech rights must be interpreted by more than a simple textualist manner and that we look to the history surrounding it. "[T]he main purpose of such constitutional provisions is to prevent all such previous restraints upon publications as had been practiced by other

---

[7]*See id.* at 458–61.

[8]The noticeable change between the 1868 and 1874 constitutions is the removal of the word "speak" from the second sentence, such that the former "all persons may freely *speak*, write and publish" became "all persons may freely write and publish."

governments, and they do not prevent the subsequent punishment of such as may be deemed contrary to the public welfare."[9]

Our constitutional provision that "[t]he free communication of thoughts and opinions is one of the invaluable rights of man; and all persons may freely write and publish their sentiments on all subjects" is a clear reference to natural law.[10] It is certainly broader than the federal language. And 'communication' necessarily is an inclusive word choice. The grammatical structure and phrasing of this sentence sets forth very broad, strong protection for the free communication, writing and publishing of ideas: all persons, all subjects.

We then move further to look to what was understood as acceptable limits in common law near the adoption of our constitution. As this is a common phrase in state constitutions, courts and commentators alike have opined on its meaning. [11] In 1804, the Pennsylvania Supreme Court explained it this way:

> [E]very citizen may freely speak, write or print *on any subject,* but is accountable for the *abuse* of that privilege. There shall be no licenses of the press. Publish as you

---

[9] *Patterson v. Colorado*, 205 U.S. 454, 462 (1907) (cleaned up).

[10] "Americans typically viewed natural rights as aspects of natural liberty that governments should help *protect* against private interference (through tort law, property law, and so forth) and that governments themselves could *restrain* only to promote the public good and only so long as the people or their representatives consented." Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L.J. 246, 251 (2017).

[11] *See, e.g.*, Cooley, *supra* note 6, at 466 ("[W]e understand liberty of speech and of the press to imply not only liberty to publish, but complete immunity from legal censure and punishment for the publication, so long as it is not harmful in its character, when tested by such standards as the law affords. For these standards we must look to the common-law rules which were in force when the constitutional guaranties were established, and in reference to which they have been adopted.").

please in the first instance without control; but you are answerable both to the community and the individual, if you proceed to unwarrantable lengths.[12]

This historical understanding of the text—that freedom to communicate was expansive but still limited by the common law—is bolstered by our caselaw from the period. In *Neel v. State*,[13] a lawyer was held in contempt of court for writing and placing a note on a circuit judge's office door accusing the judge of being a base and corrupt man. This court reversed, holding that we had the right derived from the common law to punish for contempt, but that there was no contempt in the matter at hand because the note did not attack the judge's official conduct.[14] Then, in *State v. Morrill*,[15] this court upheld a contempt charge where the defendant published a paper claiming the judge in a case had taken bribes. This court considered whether the freedom of the press precluded the contempt order and found it did not:

> Any citizen has the right to publish the proceedings and decisions of this court, and if he deem it necessary for the public good, to comment upon them freely, discuss their correctness, the fitness or unfitness of the judges for their stations, and the fidelity with which they perform the important public trusts reposed in them, but he has no right to attempt, by defamatory publications, to degrade the tribunal, destroy public confidence in it, and dispose the community to disregard and set at naught its orders, judgments, and decrees. Such publications are an abuse of the liberty of the press, and tend to sap the very foundation of good order and well-being in society, by obstructing the course of justice.[16]

---

[12] *Respublica v. Dennie*, 4 Yeates 267, 269–70 (Pa. 1805).

[13] 9 Ark. 259, 260 (1849).

[14] *Id.*

[15] 16 Ark. 384, 403 (1855).

[16] *Id.*

In other words, one of the key limitations on the freedoms of speech and of the press was the court's inherent ability to protect the administration of justice. Thomas Cooley, the most prominent commentator on state constitutions during the mid-nineteenth century, put it this way:

> *Except so far as those guaranties relate to the mode of trial, and are designed to secure to every accused person the right to be judged by the opinion of a jury upon the criminality of his act,* their purpose has evidently been to protect parties in the free publication of matters of public concern, to secure their right to a free discussion of public events and public measures, and to enable every citizen at any time to bring the government and any person in authority to the bar of public opinion by any just criticism upon their conduct in the exercise of the authority which the people have conferred upon them.[17]

Cooley makes plain that strong protections for freedom of speech and publication like those included in the Arkansas Constitution nevertheless do not diminish a court's ability to administer justice and ensure defendants receive a fair trial. This allows me to reach the conclusion that gag orders are constitutional under the Arkansas Constitution.

Having determined that gag orders are constitutional, I can apply the analysis to the facts before us. The gag order issued was a prior restraint on speech of the broadest possible order. It prohibited speech by the parties, attorneys, trial participants, and third parties unconnected with this case, which did not exclude the media.[18] Moreover, the circuit court failed to make any findings of fact that there was a sufficient threat for such a broad prior restraint. Our constitution does not support prior restraints on speech and publication absent

---

[17]Cooley, *supra* note 6, at 465 (emphasis added).

[18]Media was not particularly targeted by the gag order, yet it arguably was covered by it. The Arkansas Constitution closely aligns freedom of speech and of the press, and it stands to reason that we should as well.

extreme circumstances. Perhaps if a circuit court were to find such a threat of material prejudice to the proceedings, it may be appropriate for that court to take action.

As discussed above, article 2, section 6 of the Arkansas Constitution generally prohibits prior restraints on speech and publication and provides the strongest possible protection for the free communication of thoughts and opinions. This protection is broader than that provided by the federal constitution.[19] Yet a close examination of the text and history shows this protection is not unlimited. Consistent with the common law at the time of adoption, article 2, section 6 does not prevent a court from limiting speech to ensure the proper administration of justice. The tests adopted by the majority for issuing judicial gag orders are designed to maximize the freedom of speech and press and are narrowly tailored to achieve that goal. As the majority's tests are consistent with the original meaning of the

---

[19]Multiple state supreme courts that have similar language in their respective state constitutions have interpreted those clauses to generally provide broader protection for freedom of speech and press than the First Amendment of the United States Constitution. *See, e.g.,, Oberholzer v. Galapo*, 322 A.3d 153, 167 (Pa. 2024) (Pennsylvania's constitution, which states that '[t]he free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty" "provides protection for freedom of expression that is broader than the federal constitutional guarantee"); *Golden Gateway Ctr. v. Golden Gateway Tenants Assn.*, 29 P.3d 797, 801 (Cal. 2001) (interpreting the California Constitution's free speech clause, "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right," as more "definitive and inclusive" than the First Amendment of the United States Constitution); *Bock v. Westminster Mall Co.*, 819 P.2d 55, 59 (Colo. 1991) ("Colorado's tradition of ensuring a broader liberty of speech is long. For more than a century, this Court has held that Article II, Section 10 provides greater protection of free speech than does the First Amendment."); *State v. Reece*, 757 P.2d 947, 954 (Wash. 1988) (recognizing that the concept of free speech in the Washington Constitution, which states that "[e]very person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right," is interpreted more broadly than the federal constitution).

Arkansas Constitution, I agree with their creation, but I would adopt them under the Arkansas Constitution.

I concur in the judgment.

**NICHOLAS J. BRONNI, Justice, concurring.** Public officials aren't immune from public criticism—judges and prosecutors included. Because the circuit court's gag order violates that principle, I join the majority's opinion granting the writ and vacating that order. But that sweeping order is only one part of a troubling pattern of attempts to shield this case from public view—beginning with a nonpublic arraignment and ending with a handwritten note sealing "[t]he entire case" from public view. We cannot allow that pattern to continue unchecked. So I'd invoke this court's superintending authority and reassign this matter to a new circuit court judge. *See Steinbuch v. Pulaski Cnty. Cir. Ct.,* 2024 Ark. 101, at 3, 689 S.W.3d 56, 58. Anything less suggests that what's happened so far is within the acceptable range of disagreement or administration—and it isn't.

Begin with the gag order itself. On its face, that order targets a broad swath of people, barring them from "[e]xpress[ing] . . . an opinion, or mak[ing] any comment" about whether the evidence "tend[s] to establish the guilt or innocence of the Defendant." Worse, the order itself was sealed, raising serious concerns about selective enforcement. And it doesn't explain why such an extreme remedy was warranted, instead just declaring it would "help ensure all parties get a fair trial." Nor did the circuit court explain why it extended the gag order beyond what even the State thought was appropriate, broadening it to cover the defendant's family and, even more significantly, sealing "[t]he entire case." On the contrary, the circuit court entered that order just six minutes after the clerk docketed the

26

defendant's 19-page opposition to the State's motion—or barely enough time to make a pot of coffee. That approach cannot be squared with the First Amendment, and it underscores that the gag order wasn't a last resort but an unconstitutional impulse.

Context suggests why. The same circuit court that issued the gag order here also granted Michael Fosler's release on bail. It's that decision—which the defendant's lawyers called a decision to release "a predator" who "repeatedly violated [the defendant's] child . . . on a low bond"—that set off a chain of events that led to the fatal confrontation that's the subject of this case. And it's that criticism that the State claimed, and the circuit court effectively concluded, justified gagging the defendant, his lawyers, and others. This sequence raises serious concerns. Indeed, if openness "enhances . . . the appearance of fairness so essential to public confidence in the system," then secrecy has the opposite effect—it erodes trust. *Press-Enter. Co. v. Superior Ct. of California, Riverside Cnty.*, 464 U.S. 501, 508 (1984); *accord Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 606 (1982).

The effort to shield these proceedings from public view also didn't begin with the gag order; it started with the circuit court's decision to arraign the defendant away from public view. And even setting aside the potential constitutional concerns raised by a nonpublic arraignment, that decision highlights the order on review here isn't an isolated problem. *See Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty.*, 478 U.S. 1 (1986) (discussing two-part test for determining whether First Amendment right to access criminal proceeding attaches); 1 William Blackstone, *Commentaries* 132 ("confinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten;

27

is a less public, a less striking, and therefore a more dangerous engine of arbitrary government."). Rather, it suggests a Star Chamber–like atmosphere. We cannot allow that to continue.

Ultimately, judges and prosecutors enjoy "no greater immunity from criticism than other persons or institutions." *Landmark Comm'ns, Inc. v. Virginia*, 435 U.S. 829, 839 (1978) (quoting *Bridges v. California*, 314 U.S. 252, 289 (1941) (Frankfurter, J., dissenting)). Nor should they. "Public vigilance serves us well, for 'the knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.'" *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1035 (1991) (quoting *In re Oliver*, 333 U.S. 257, 270 (1948)); *see also Morrison v. Olson*, 487 U.S. 654, 728 (1988) (Scalia, J., dissenting) ("Under our system of government, the primary check against prosecutorial abuse is a political one."). Instead, "justice should not only be done, but should manifestly and undoubtedly be seen to be done." *R v. Sussex Justices, Ex parte McCarthy* (1924) 1 KB 256, 259, All ER Rep 233, 234.

So I join the majority's decision granting the writ and vacating the gag order, but I would go a step further. The repeated attempts to veil these proceedings in "[s]ecrecy . . . can only breed ignorance and distrust of the courts and suspicion concerning the competence and impartiality . . . of the entire criminal justice system." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J., dissenting). Remedying that danger warrants strong medicine, and I'd apply it.

WOMACK and HILAND, JJ., concur.

*Lassiter & Cassinelli*, by: *Erin Cassinelli* and *Michael Kiel Kaiser*, for appellant.
*Tim Griffin*, Att'y Gen., by: *Joseph Karl Luebke*, Ass't Att'y Gen., for appellee.